[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION RE: INJUNCTION
This court heard this case in the fall of 1990 and granted an injunction on December 21, 1990. An appeal was taken. Before the appeal was heard the Supreme Court recognized that there might have been a change of circumstances that might require this trial court to at least reconsider its injunctive order. As a result, after its hearing, the Supreme Court set the judgment aside and remanded the matter to this trial court "to reexamine the equitable considerations relevant to the exercise of its discretion in light of the uncontemplated change in circumstances." Tomasso Bros., Inc. v. October Twenty-Four, Inc., 221 Conn. 199, 202.
Upon remand, this court assumed the matter would be relatively short. Sixty-four pages of legal paper, much new evidence, another view, legal argument and multiple briefs later it was over.
Facts
All the stipulated facts found by the court in its Memorandum of Decision of December 21, 1990 (Old Memo) are still facts unless modified by this opinion.
The court reconfirms it own findings from that opinion except as noted. The court treats the defendants for the purposes of this opinion as one entity.
The parties agreed that all the "old" exhibits were to be used with all of the "old" testimony. Part of the "old" CT Page 7519 evidence this court now uses solely to compare and contrast the "new circumstances" to those found in this court's memo.
Although the Supreme Court opinion might seem only to suggest a "change in [plaintiff's] circumstance" the defendant claims that the trial court is not precluded from "consideration of the Defendants' change in the nature and scope of its activities and the resulting effects upon the Plaintiff's plan of development" and the court agrees.
Defendant has taken some action that can result in noise reduction. Defendant suggests some other ideas to reduce noise production.
This court found in its original decision that plaintiff had "prepared tentative plans for" development of its land as "an office park with a modest hotel". As the Supreme Court noted "the plaintiff has applied to the Town of Plainville to make `a minor change in the original site plan application' by `deletion of the originally proposed 100-room hotel and the addition of a four-story office building in its place'". Id. 200.
As proven in this court the change in plaintiff's plan that is most relevant is the removal of a building to be used solely as a hotel and the substitution of a building to be used only partially for human residence, i.e., a four-story office conference center ("OCC") with forty rectangular rooms of about 12 feet by 24 feet for overnight accommodations. There are also training rooms, conference rooms and food service with dining facilities in that OCC. This substitute building is about 130 feet closer to the defendants' property line. It is also about 50 feet closer to the face of the blasting operation. Plaintiff has filed a new plan revised to February 11, 1992.
Since the original trial the plaintiff has gotten Town of Plainville Inland Wetlands Commission ("PIWC") approval for its proposed project; has made application for site plan approval for its plan revised to February 11, 1992 to the Plainville Planning Zoning Commission ("PPZ"); and attended the public hearings on that application. On May 12, 1992 the application was unanimously approved. Defendant has filed an appeal in this court from that approval.
Plaintiff has also provided the City of New Britain with all these site plans and drawings and made presentations to the staff of the City's various departments.
Plaintiff has been working and talking with the CT Page 7520 public utilities and the municipal sewer and water utilities of both towns to line up commitments for the project. Both towns have adequate capacity to supply the entire project with water and to accept sewage from the project. Neither has yet agreed to allow the other to provide water and sewer service in its municipality. This will require inter-local agreements which are done commonly by municipalities. The natural gas, electrical and telephone utility companies have all committed to supply the project.
Plaintiff has caused to be prepared a "Traffic Impact Analysis" and a large set of "Drainage Calculations", with detailed maps.
As far as financing the project and its ultimate chances of success are concerned, the changes are a positive factor. The new proposed use is the highest and best use for the land. Financing is still available if the defendant's quarry is silenced. The court still concludes that no quarry will ever operate on the land across from North Mountain Road (aka Loon Lake Road).
Present noise conditions with the quarry in operation, but without blasting are as follows: At the monument which is very close to the northwest corner of the proposed OCC the ambient noise is 50 dba. The highest readings from the new hydraulic drill is 71 dba. That level is reached when the drill rods are being changed. The readings at the site of the plaintiff's new proposed building are 60 to 92 dba. The quarry has been moved about 80 feet further away from plaintiff's property line but the proposed project has been moved about 130 feet closer to the quarry.
If the defendants' quarry noise is stopped, plaintiff expects to proceed to obtain the remainder of municipal approvals and then begin some road work. Its next step would be to try to obtain some tenants. Next, it would obtain financing and finally it would prepare the site and build the buildings.
In regard to defendants' position, the following has occurred since the original trial: The ram hoe that was used to break large or "secondary" rock has been removed from the North Mountain Road site to the defendants' Camp Street plant. Other methods must now be used to break that rock on site. The freestanding compressors are no longer on the North Mountain Road property. The trucks have been lined with steel and rubber belts and sand has been added to their bottoms. A new hydraulic drill in place of a pneumatic drill is in use. CT Page 7521
When we look at the quantity of rock taken out it is clear that blasting is continuing with about the same intensity and frequency as in 1990 and 1991. That will continue for at least another seven or eight years.
The sleeping and living rooms in the OCC are on the top (fourth) floor. From its views of the property on two occasions it is clear to the court that the quarry operation may be seen by any person who has the right to live and sleep in those rooms.
The new hydraulic drill emits sound which when measured at plaintiff's northly line is between 72 dba and 66 dba.
Blasting from the quarry face would register about 118 decibels (db) at the property line.[1] That is a particularly annoying kind of sound because it is intermittent and startling. It is called impact or impulse noise.
Any noise which is in excess of 5 dba over the ambient noise level will produce annoyance in the hearer. When that excess is over 10 dba major negative reactions in the hearer are to be expected. The court finds (1) that at some periods during every day of defendant's quarry operation the noise levels coming from that operation would exceed 5 dba over the ambient noise inside plaintiffs' proposed OCC; (2) that at some periods during every day of the defendant's quarry operation the noise levels coming from the operation would exceed 10 dba over the ambient noise inside plaintiff's proposed OCC, and (3) that every day of defendants' quarry operation during which blasting occurs the noise levels from that blasting will be at least 60 dba over the ambient noise inside plaintiff's proposed OCC and will produce startle effects in the hearers. The finding of number (2) and (3) above would also be annoying and unacceptable to persons who would be expected to use the OCC for meetings, conferences and meals.
Standing outside the proposed OCC on the ground or on the balconies, back-up "bells" on trucks, drilling noises, compressors and "bangs" from dump trucks can all be heard coming from defendants' quarry. These noises can be separately distinguished from the ambient noise, which is almost entirely traffic noise from the federal highway known as I-84.
Conclusions
The noise generated by defendants' operation of the quarry is a nuisance to plaintiff and is unreasonable. Plaintiff is being irreparably injured by that present nuisance and it has no adequate remedy at law. CT Page 7522
Defendants' business is not in jeopardy. We must now balance the harms and benefits to all the parties. When this is done it is clear that the equities are overwhelmingly in favor of plaintiff.
Order
I. Injunction
Defendants shall cease all quarrying activity including but not limited to blasting and rock removal from the Corporation's property within ten (10) days after plaintiff's plan of development for a technology park development is approved by the appropriate authority of the Town of Plainville. This does not include filing of any plan or plans with the town clerk.
II. "Automatic Stays"
Defendant argues that because some or all of plaintiff's various applications to municipal boards and agencies are subject to appeal when granted and some are in fact being appealed that this court may not issue an injunction until all such appeals are finally resolved. That would not be appropriate in this case. The defendant is clearly in the wrong. The plaintiff has the right to try to develop its property.
It may be that plaintiff will continue to spend a lot of money for maps, engineers, plans, financing and some permitted infrastructure only to find that as to some municipal authority it fails. However, the court is firmly convinced that plaintiff's proposed development is reasonable today and that it will be so perceived and treated by all municipal authorities. Therefore, there shall be no "automatic stay" of this court's order by virtue of any such appeals.[2]
NORRIS L. O'NEILL JUDGE, SUPERIOR COURT